Richard CHARRON and Dianne Charron, and John J. and Gloria Hanna, and Andre and Suzanne Gill, and Wayne A. and Sharyn Rutledge, and Garnet E. Bailey, and Ross Lonsberry, and Gilles Marotte, and Douglas R. Favell, Jr., and Gary Noel Price, Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

Nos. 98–5021 to 98–5024, 98–5026 to 98–5030.

United States Court of Appeals, Federal Circuit.

Dec. 27, 1999.

Charles L. Abrahams, Law Offices of Charles L. Abrahams, of San Diego, California, argued for plaintiffs-appellants.

Annette M. Wietecha, Attorney, Appellate Section, Tax Section, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Loretta C. Argrett, Assistant Attorney General, and Ann B. Durney, Attorney.

Before NEWMAN, Circuit Judge, SKELTON and FRIEDMAN, Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge.

These are nine consolidated appeals in which Canadian citizens sought refunds of United States income taxes paid on income received for playing professional ice hockey for United States teams. The Court of Federal Claims denied the exclusions and deductions from income that the plaintiffs sought. The trial judge also denied a motion that she disqualify herself. We affirm.

I

These cases were filed in the Court of Claims (the trial division of which was the predecessor to the Court of Federal Claims) in the mid–1970's, seeking refunds of federal income taxes paid in the mid and late 1960's and early 1970's. They were part of a larger number of similar cases (approximately 200) that were so filed, all asserting substantially the same claims. A single lawyer, Charles L. Abrahams, represented all the plaintiffs.

The plaintiffs in the present nine cases (like those in most of the other cases) are Canadian citizens who played professional ice hockey for United States teams (the "Players" which, where appropriate, includes their spouses who are parties).

They seek refunds of United States income taxes they paid between 1967 and 1974. Their complaints asserted two types of refund claims. First, they alleged that they were entitled to exclude from their taxable United States income amounts reflecting the portion of their salaries "earned" while living and performing services in Canada during the off-season. Second, they sought to deduct expenses allegedly incurred throughout the year in connection with their hockey playing activities while living in the United States in their respective teams' home cities and while traveling with their respective teams during the hockey season. These expenses included the costs of sports equipment and other personal items, including haircuts, entertainment, home telephone lines and television.

After the Internal Revenue Service denied their refund claims, the Players filed the present suits. Following separate trials, the Court of Federal Claims, in a series of opinions, rejected all the claims and dismissed the complaints.

The court held that the Players had not established that a portion of their salaries was excludable from taxable income under 26 U.S.C. §§ 861(a)(3), 862(a)(3), 871(b), or 26 C.F.R. § 1.861–4, discussed in part III, below, because it was for services that they had rendered in Canada in the off-season. The court ruled that a provision in their employment contracts requiring them to report to the training camp "in good physical condition" was not a contractual promise to undertake specified physical conditioning during the off-season, but merely a condition of their employment. The court further found that they had not established the number of days they spent in Canada attending training camp or playing games there during the regular season.

The court rejected the Players' claims for deductible business expenses for three reasons. With respect to some claims, it held that the Players failed to prove that a valid power of attorney was on file with

the Internal Revenue Service when their attorney filed them. The court dismissed a number of other claims because the Players had not filed administrative refund claims with the Service, as section 7422(a) of the Internal Revenue Code required. *See* 26 U.S.C. § 7422(a). The court dismissed the remaining claims because the Players failed to substantiate them with adequate records or credible testimony.

## II

A. In 1986 the hockey player cases were reassigned to Judge Horn of the Court of Federal Claims after Judge Miller, to whom they originally had been assigned, retired. In May 1991, the appellant Favell and the "plaintiffs" in "related cases" moved to disqualify Judge Horn "because of her personal bias and prejudice against plaintiffs and their counsel." The motion was combined with a thirty-eight page supporting memorandum and accompanied by a sixteen page "Declaration" of Mr. Abrahams, which set forth various alleged facts.

After oral argument, Judge Horn ruled that the Players had not established a basis for recusal. She stated that she had "seen nothing in the record that raises the specter" of her "having a personal bias against the Plaintiffs and their counsel ... or anything that raises the appearance of that." Toward the end of the hearing, she stated:

In sum, I have no personal bias. I have no antipathy towards either you or your clients. I have not stepped off the bench and become an advocate for the Defendant as you have alleged. The Defendant will be held to the same strict standards to which you will be held.

As you know, rulings adverse to a party certainly cannot form the basis for disqualification. To the extent that you have taken any of my remarks to be sarcastic or curt, which you have alleged in your pleadings, they were not meant to be disparaging. Certainly I have tried to be accurate as I have tried to

tell you that I do or do not believe something that you may be arguing.

You may not like the manner of my speech. I'm sorry about that, but not everybody is going to like everybody else, and it may well be that you don't care for my style. It may well be that you don't care for the manner in which I conduct proceedings, but that still does not suggest that I have a bias or a prejudice against you, and certainly since I have had no contact with your clients whatsoever, I can have no bias or prejudice towards them, and do not.

She concluded that "there are no grounds for me to recuse myself in this case." The court wrote no opinion and entered the following order: "DENIED at an oral argument and status conference on 6/27/91. See transcript of recorded hearing."

The Players filed with this court a petition for writ of mandamus to compel Judge Horn to recuse herself, which this court denied. *In re Favell,* 949 F.2d 402 (table), 1991 WL 209820, at *1 (Fed.Cir.1991).

B. The motion to disqualify was based upon 28 U.S.C. § 455 and Rule 63(b) of the Rules of the Court of Federal Claims. Section 455 provides in relevant part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party....

Rule 63 provides in relevant part:

(b) Voluntary Disqualification. A judge shall withdraw from a case when required by 28 U.S.C. § 455, and, at any time, may withdraw from a case if otherwise such judge deems such judge disqualified by bias or prejudice.

(c) Affidavit of Bias or Prejudice.

(1) Whenever a party to any proceeding makes and files an affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against such party or in favor of any adverse party, such judge, if such judge determines that the affidavit is sufficient and timely, shall proceed no further therein, but another judge shall be assigned to hear such proceeding. The ruling of the judge shall be by order.

(2) The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists. . . . It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

■ Assuming *arguendo* that the attorney's declaration satisfied the requirements of Rule 63(c) that the affidavit of bias and prejudice be filed by "a party" and be accompanied by a certificate of counsel that it is "made in good faith"—a dubious assumption—the documents filed did not establish a disqualifying personal bias or prejudice or the appearance of partiality.

Rule 63 contains the same requirements and standards as 28 U.S.C. § 144, the federal statute governing recusal of district court judges for personal bias or prejudice. Cases construing and applying section 144 therefore may properly may be looked to in interpreting Rule 63. *See Northcross v. Board of Educ.*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973). Under those provisions the challenged judge must accept as true the factual allegations upon which recusal is sought, and determine whether those facts "give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Berger v. United States*, 255 U.S. 22, 33–34, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (interpreting the predecessor to section 144); *Bell v. Chandler*, 569 F.2d 556, 559 (10th Cir.1978) (interpreting section 144).

It cannot be determined from Judge Horn's statements at the disqualification hearing whether she denied recusal because (1) she concluded that the facts set forth in the Memorandum and the Declaration (as distinguished from the Player's characterizations of those facts and the inferences they drew therefrom in those documents) were legally insufficient to establish personal bias and prejudice or to create the appearance of partiality or (2) she determined that she was not so biased and prejudiced and had not created such an appearance. To whatever extent she relied upon the latter determination, such reliance would have been inappropriate. Any such error, however, was harmless because even accepting the facts the Players alleged, they were insufficient to establish personal bias and prejudice or the appearance of partiality.

Although the Players have not made clear the precise factual bases and theory of their claims, it apparently rests largely upon Judge Horn's treatment of and actions respecting their counsel, Mr. Abrahams. Other than conclusory statements, the Players make no attempt to demonstrate personal bias and prejudice against them. The claim seems to be that the judge was personally biased and prejudiced against Mr. Abrahams.

At the argument on the motion, Mr. Abrahams stated that there was "a deep-seeded [sic] [judicial] bias against me that has to have an impact on my clients" and referred to "the bias the Court has against me and it has to have an impact on my clients and against my clients." Ordinarily an allegation of judicial bias relates to bias against a party. Although it is possible that judicial bias against the lawyer may become so pervasive and clear that the client's rights are likely to be affected, *cf. Rosen v. Sugarman*, 357 F.2d 794, 798 (2d Cir.1966), this is not such a case.

The closest the Players come to explaining their theory are their statements that "Judge Horn erred as a matter of law by not recusing herself" and that "[t]here

were numerous instances reflecting the Court's bias which forced dismissals and caused unnecessary protracted [sic] litigation." These instances, the Players urge, included several occasions on which Judge Horn accused Mr. Abrahams of malpractice, defrauding the court, filing a frivolous action, and doctoring the record and instances when Judge Horn prevented Mr. Abrahams from conferring with his clients.

The judicial comments and actions upon which the Players rely, however, merely reflect Judge Horn's evaluation and criticism of Mr. Abrahams' handling of the cases and her perception that his professional performance was severely deficient. For example, viewed in context, they reflected her concern over Mr. Abrahams' failure to maintain regular contact with his clients, irregularities in documents he filed, certain plaintiffs' failure to appear for trial, and the lack of adequate documentary support for the Players' claims. These were factors that she derived solely from her conduct of the litigation. The judge's comments and actions, however, do not establish either personal bias and prejudice or the appearance of partiality. "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). As the Supreme Court has pointed out,

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.... [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings ... do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties,

or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.... *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

In *Rosen v. Sugarman,* 357 F.2d at 798, the court, speaking through Judge Friendly, stated:

> A judge is not to be faulted as biased or prejudiced because he has considered that the effective discharge of his responsibility over proceedings before him ... has demanded the consistent rejection of an attorney's contentions or strong measures to prevent what he regards as inexcusable waste of time. Moreover, an occasional display of irritation, usually regretted as soon as made, does not suffice to show personal bias or prejudice, whether the irritation was justified or not.

These statements fully apply to what Judge Horn said and did in these cases. She properly declined to recuse herself.

### III

Under the Internal Revenue Code, nonresident aliens who earn income in the United States are subject to federal income tax on the portion of their income derived from services performed in the United States; they may exclude from taxable income any amount earned for services performed outside the United States.

*See* 26 U.S.C. §§ 864(b), 871(b), 872(b); 26 C.F.R. §§ 1.864–2(a), 1.871–8(a). If accurate allocation of income between the two sources is impossible, the Treasury Regulations provide that

> the amount to be included in the gross income shall be determined by an apportionment on the time basis; that is, there shall be included in the gross income an amount which bears the same relation to the total compensation as the number of days of performance of the labor or services within the United States bears to the total number of days of performance of labor or services for which the payment is made.

26 C.F.R. § 1.861–4(b)(2).

In other words, the amount of the exclusion from taxable income is calculated by dividing the number of days worked outside the United States by the total number of days worked, and then applying that fraction to the total compensation received. The Players invoke these provisions by seeking to exclude from their salary the days spent in Canada on which they did physical training, attended pre-season training camps, and played regular season games there.

■ A. The Players contend that because their employment contracts required them to report to the training camp "in good physical condition," they were obligated to engage in physical conditioning and that the portion of their salaries for the days spent in Canada doing so were excludable from their taxable income. The Court of Federal Claims rejected this contention on a motion for partial summary judgment, holding that the requirement that the Players report "in good physical condition" constituted a contractual condition rather than a promise to perform services, and thus none of the Players' salary could be attributed to the time in Canada during the off-season in which they engaged in physical conditioning. *See Favell v. United States,* 16 Cl.Ct. 700 (1989), *appeal denied,* 22 Cl.Ct. 132 (1990). We agree.

Under the National Hockey League Standard Player Contract, which each of the players signed, the Players agreed to play hockey for the particular team, which agreed to pay them a specified salary. The Players "agree[d]" to do various things, including to report to the training camp "in good physical condition" and "to keep [themselves] in good physical condition at all times during the season." The contract did not state how the Players were to maintain their good physical condition or require them to take any specific action to do so.

In the only other appellate decision to consider the issue, the Second Circuit, reviewing a decision of the Tax Court in a similar hockey player case, held that the "physical conditioning" requirement in the Hockey Players Standard Contract was "a condition of employment," not "a contractual obligation." *Stemkowski v. Commissioner,* 690 F.2d 40, 46 (2d Cir.1982). Noting that "[d]uring the off-season, the contract imposes no specific obligations on a player," the court ruled:

> Fitness is not a service performed in fulfillment of the contract but a condition of employment. There was no evidence that [the taxpayer] was required to follow any mandatory conditioning program or was under any club supervision during the off-season. He was required to observe, if anything, only general obligations, applicable as well throughout the year, to conduct himself with loyalty to the club and the league and to participate only in approved promotional activities.

*Id.*

The distinction between contractual conditions and contractual promises has been aptly summarized by the Ninth Circuit:

> A condition creates no right or duty of and in itself, but is merely a limiting or modifying factor. If it is breached or does not occur, the promisee acquires no right to enforce the promise. A promise raises a duty to perform and its breach

subjects the promisor to liability and damages, but does not necessarily excuse performance by the other party. *United States v. Schaeffer*, 319 F.2d 907, 911 (9th Cir.1963) (citing 5 Williston on Contracts, §§ 663, 665 (3d ed.1961)). We agree with this distinction and with the *Stemkowski* court's reasoning, which fully support our identical conclusion that the "physical condition" provision of the contract created a contractual condition, not a contractual commitment.

The Players contend, however, that there are factual distinctions between their cases and *Stemkowski*. They do not explain, however, the significance of those alleged distinctions or show that they require a different result here. Our decision turns upon the meaning and effect of the contractual provision, which is indistinguishable from the provision involved in *Stemkowski*.

B. At oral argument on September 7, 1999, the Players contended that even if they lose on the "physical condition" issue, they are at least entitled to prevail on the training camp and games in Canada issues. They state that in *Stemkowski* and the subsequent decision of the Fourth Circuit in *Hanna v. Commissioner*, 763 F.2d 171 (1985), involving a case which was consolidated in the Tax Court with *Stemkowski*, the appellate court held that these two items were excludable from income, and that the government had conceded the issue and had stipulated to their entitlement to exclude those amounts from taxable income. The government responded that even if the Players' time spent in Canada while attending training camp and playing games was excludable from their gross income, they have not established the number of days on which they had done so.

In the ensuing colloquy with counsel, it appeared to the court that the number of days each of the Players spent in Canada attending training camp and playing games were simple objective factual issues that the parties should be able to agree upon. We therefore requested and encouraged counsel to try to reach an understanding on the number of days involved and within ten days to report to the court with results of their discussions.

By letter dated September 15, 1999, Mr. Abrahams sent the court copies of the letter of the same date he had sent to the Department of Justice "documenting support for the stipulation regarding the training camp." The latter letter stated that after the oral argument Mr. Abrahams had given government counsel "references to the appendix to support *the Stipulation that training camp is for thirty (30) days in Canada for each appellant, and is excludable from U.S. income.*" (emphasis in original). The letter also stated that "[p]ursuant to the Court recommendation, I will be submitting other Proposed Stipulations with supporting documentation from the Appendices."

On September 17, 1999, the government's attorney replied to that letter, stating that she had been "unable to fully review the record in this case" but that the "portions of the record that I have reviewed, however, including portions to which Mr. Abrahams directed my attention, do not support Mr. Abrahams' contention that the Government entered into any stipulation regarding the number of days spent in training camp." She stated that Mr. Abrahams also had referred to hockey schedules and registers for each player from which the number of games each player played in Canada could be determined, but that in her review of "the files for these taxpayers" she had "not been able to locate exhibits of this nature for each taxpayer.... Mr. Abrahams has not directed my attention to any portions of the record in this regard. Furthermore, even if the number of games that each team played in Canada can be determined, it is not clear whether each of the taxpayers here were [sic] in attendance at all of those games." She further stated that "I believe that I can conclude my review of the record and furnish a more

thorough report to the Court by September 24, 1999."

On September 16, 1999, Mr. Abrahams sent to the court a copy of his second letter to government counsel dated the same date "documenting support for various stipulations" and which "supplement[ed] the previous letter." The latter letter, eight pages long, included various attachments.

We have received nothing further from either side on this issue.

For whatever reason, the parties apparently have been unable to reach agreement on the number of days each of the Players spent in Canada attending training camp or playing games. We therefore must decide the issue on the record before us.

■ Since the Players were seeking refunds of taxes they had paid, they have the burden of proving they are entitled to the amount sought. *See United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (citing *Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932)). To prevail on this claim, they were required to establish not only the excludibility of the items from taxable income, but also the amount, i.e., the number of days spent in Canada playing games and attending training camp. The Court of Federal Claims found that none of the Players had adequately substantiated their claims on the number of days so spent. These findings are not clearly erroneous. They compel rejection of the Players' claims to exclude from their taxable income the portion of their salaries covering the time spent in Canada attending training camp and playing games.

IV

A. Section 873(a) of the Internal Revenue Code allows nonresident aliens to deduct expenses incurred in connection with the pursuit of a trade or business in the United States. 26 U.S.C. § 873(a). Section 162(a) permits taxpayers to deduct all "ordinary and necessary expenses" incurred in connection with such trade or business. 26 U.S.C. § 162(a). Section 274(d) requires a taxpayer to substantiate deductions "by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift." 26 U.S.C. § 274(d) (1964).

■ The Players seek deductions for a litany of expenses incurred in connection with playing hockey, including the costs for living in the their teams' home cities, travel, entertainment, personal grooming, sports equipment, and home phone and television costs. The claimed deductions of the appellant Bailey, for the tax years 1968, 1969 and 1971, are illustrative:

|  | 1968 | 1969 | 1971 |
|---|---|---|---|
| Tax Preparation | 25.00 | 35.00 | 692.00 |
| Hockey Association Dues | 75.00 | 160.00 | 175.00 |
| State Disability | 74.00 | 160.00 | 74.00 |
| Trade Publications | 60.00 | 74.00 | 75.00 |
| Home T.V./Telephone | 60.00 | 152.00 | 78.00 |
| Promotional Expenses | 75.00 | 128.00 | 260.00 |
| Conditioning Expenses | 185.00 | 407.00 |  |
| Contributions | 50.00 | 430.00 | 154.00 |
| Sales Tax |  | 125.00 | 131.00 |
| Entertainment |  | 51.00 |  |
| Golf Shoes |  | 365.00 | 30.00 |
| Golf Balls |  |  | 120.00 |
| Green Fees |  |  | 410.00 |
| Sweatsuit |  |  | 25.00 |
| Swim Suit |  |  | 10.00 |
| Running Shoes |  |  | 17.00 |
| Tennis Balls |  |  | 20.00 |
| Tennis Shoes |  |  | 10.00 |
| Auto |  | 232.00 |  |
| Tolls & Parking |  | 36.00 |  |
| Home Office |  | 240.00 |  |
| Office Utilities |  | 36.00 |  |
| Moving Expenses | 100.00 | 40.00 |  |
| Meals & Lodging |  | 635.00 |  |
| State Income Tax |  | 96.00 | 889.00 |
| League Fees |  |  | 450.00 |
| Therapeutic Treatment |  |  | 200.00 |

Each of these nine cases was tried separately. In each, the trial court wrote a lengthy opinion, ranging from fifty-seven to one hundred pages. Each opinion discussed all the evidence and the legal issues at length, and fully explained the court's

reasoning and decision on the issues before it.

The Court of Federal Claims rejected all of these deductions. It held that no valid power of attorney had been filed with the Internal Revenue Service for some of the refund claims and that no valid refund claims had been filed for others. It rejected the remaining claims because the Players had not substantiated them. In this appeal the Players argue mainly the third issue.

With the single exception discussed in point IV.B below, the Players submitted no valid documentation of their claims. Instead, they relied on their testimony and their tax returns. In each case the court concluded that the testimony was vague, unpersuasive, unsubstantiated, and did not support the claimed deductions. For example, the court characterized the appellant Bailey's testimony as "minimal and unresponsive" and "faulty and uncertain," the appellant Favell's testimony as "unpersuasive, overly general and insufficiently probative," and the appellant Gill's testimony as "vague and insufficient." Indeed, in his cross-examination Favell repeatedly described the amount of several of his claimed deductions as a "guess." There is no need to discuss each of those opinions. We hold that the court justifiably held that none of the Players had introduced sufficient evidence to substantiate the claimed deductions.

The Players invoke section 1.274–5(c)(5) of the Treasury Regulations, which provides:

Where the taxpayer establishes that the failure to produce adequate records is due to the loss of such records through circumstances beyond the taxpayer's control, such as destruction by fire, flood, earthquake, or other casualty, the taxpayer shall have a right to substantiate a deduction by reasonable reconstruction of his expenditures.

26 C.F.R. § 1.274–5(c)(5) (currently § 1.274–5A(c)(5)).

For this provision to apply, the taxpayer must establish both the prior existence of "adequate" records and their loss "through circumstances beyond the taxpayer's control." Except for the appellant Bailey, who claimed that his papers were stolen in a 1971 burglary of his apartment, none of the other Players established that their records were "lost" through circumstances beyond their control, i.e., in one of the ways section 1.274–5(c)(5) contemplates, and none established that the "lost" records were adequate in the first place. Indeed, in many instances they did not establish that they ever had any records of claimed expenditures.

The Players argue that under *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir.1930), their testimony was sufficient to support the claimed deductions. *Cohan* involved the deductibility of entertainment and travel expenses that the famous theatrical manager and producer George M. Cohan incurred in the production of his plays. At the trial before the Board of Tax Appeals, Cohan estimated that he had spent fifty-five thousand dollars during the taxable years involved, but was unable to provide any documentation therefor. The Board denied the deductions "on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details." *Id.* at 543.

The court, in an opinion by Judge Learned Hand, held that the Board erred in so ruling, *see id.* at 544, and remanded for the Board to reconsider the evidence "to make some allowance for the expenses of travel and the like." *Id.* at 546. The court explained:

The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses. Absolute certainty in such matter is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all

appears to us inconsistent with saying that something was spent. True, we do not know how many trips Cohan made, nor how large his entertainments were; yet there was obviously some basis for computation, if necessary by drawing upon the Board's personal estimates of the minimum of such expenses.

*Id.* at 543–44.

Unlike Cohan's testimony, which the Board and the court of appeals apparently accepted as establishing the fact and general total amount of the entertainment and travel expenses, the Players' testimony was rejected by the Court of Federal Claims as vague and unpersuasive. *Cohan*, therefore, does not require the conclusion that their testimony was sufficient to establish their entitlement to the claimed deductions.

In any event, as the Court of Federal Claims correctly pointed out, the *Cohan* rule has been superseded by section 274(d) of the Internal Revenue Code, which now governs the deductibility of entertainment and travel expenses. That provision, originally enacted in 1962, well before the claimed expenditures in these cases were incurred, provides in pertinent part:

No deduction shall be allowed—

(1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),

(2) for any item with respect to ... entertainment, amusement, or recreation, ... or,

(3) for any expense for gifts,

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement ..., or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift.

26 U.S.C. § 274 (1964). As a pertinent Treasury Regulation explains:

This limitation supersedes with respect to any such expenditure the doctrine of *Cohan* .... The decision held that, where the evidence indicated a taxpayer incurred deductible travel or entertainment expense but the exact amount could not be determined, the court should make a close approximation and not disallow the deduction entirely. Section 274(d) contemplates that no deduction shall be allowed a taxpayer for such expenditures on the basis of such approximations or unsupported testimony of the taxpayer.

26 C.F.R. § 1.274–5A(a)(3); *see also Dowell v. United States,* 522 F.2d 708, 714 (5th Cir.1975) (noting that "§ 274(d) requires taxpayers to substantiate—either through adequate records or through their own statements corroborated by other evidence—each and every element (amount, date, place, business purpose, and business relationship) of each and every expenditure in order to claim entertainment and travel expenses allowed under § 274 and § 162").

The Players' submissions did not satisfy the requirements of section 274(d).

**B.** The Court of Federal Claims held that the appellant Bailey had presented sufficient evidence to support part of his claimed deductions for state income taxes. The court further held, however, that the government could offset against any refund for that deduction other deductions that Bailey had improperly taken, the amount of which exceeded the allowed deduction.

■ Although the statute of limitations, 26 U.S.C. § 6501, would now bar a government suit to collect the tax related to those improperly claimed deductions, the government may "retain payments already received when they do not exceed the amount which might have been properly assessed and demanded." *Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 76

L.Ed. 293 (1932); *see also Doko Farms v. United States,* 956 F.2d 1136, 1140 (Fed. Cir.1992) ("Courts have recognized and held that the fact that the statute of limitations bars a government suit to collect an amount due to it does not bar the government from invoking its administrative remedies to offset the indebtedness against other claims by the debtor."). The Players' only argument against these offsets appears to be that the government did not assert them "in good faith." The Players, however, have not provided any valid support for that allegation. The Court of Federal Claims correctly held that the government was entitled to offset those improper deductions against Bailey's substantiated deductions.

## V

The Players present a plethora of other contentions. We have carefully considered all of these additional arguments, some of which are difficult to follow, but find them unpersuasive. The Court of Federal Claims did not err in rejecting them. There is no need or occasion to discuss them separately.

## CONCLUSION

The judgments of the Court of Federal Claims in these nine cases denying recovery are

*AFFIRMED.*